UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES SHEHEE,

    Plaintiff,

v.

Case Number 13-13761
Honorable David M. Lawson

SAGINAW COUNTY and PRISON HEALTH
SERVICES, INC.,

    Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING AMENDED COMPLAINT

When plaintiff Charles Shehee was an inmate at the Saginaw County jail, he fainted in his cell due to low blood sugar, struck his head, and broke his neck. He was transferred to a hospital nine hours later, where surgery was performed. Shehee is a diabetic, taking prescribed insulin when he was taken into custody, and his diabetes was under control. The jail doctor, Dennis Lloyd, changed his insulin prescription three months earlier when Shehee entered the jail. Shehee believes that the change was made for cost reasons, and caused his syncope and resulting injuries. He sued Saginaw County and Prison Health Services, Inc. (PHS), the private contractor that hired the jail doctor, alleging that the denial of good medical care violated the Constitution. The defendants have moved for summary judgment. Although Shehee has made out a case that jail doctor Dennis Lloyd furnished substandard medical care, Shehee faces two insurmountable obstacles to recovery against the two named defendants: his constitutional claims against PHS and Saginaw County cannot be predicated on their vicariously liability for the acts of Dr. Lloyd; and he cannot trace his injuries to the deliberate indifference of the defendants. Therefore, the motion for summary judgment will be granted.

I.

The quality of basic healthcare in the United States can best be described as uneven. And one would not anticipate that the best care would be found in jails and prisons. Nonetheless, it is reasonable to expect that certain fundamental practices would be followed, such as doctors actually examining patients before prescribing medication; and when a new physician comes on the scene, that doctor would look at a patient's medical records or talk to a treating doctor before changing medication prescribed by someone else. The medical practitioners in this case did not meet those expectations.

However, to prove that his constitutional rights were violated, the plaintiff must establish more than malpractice. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Ibid.*

The plaintiff, Charles Shehee, is a 48 year-old man with Type II diabetes. He was taken into custody on May 21, 2010 to begin serving a 12-month sentence for domestic violence. On September 13, 2010, while incarcerated at the Saginaw County Jail, his blood sugar plummeted, causing Shehee to become dizzy, fall backwards, and land on his head and neck. Although nurses contacted Dr. Lloyd, the medical director for the jail, Dr. Lloyd did not leave his private medical office in Flushing, Michigan to treat Shehee. Instead, Dr. Lloyd ordered an X-ray, which revealed that Shehee may have broken his neck during the fall. Shehee was transferred to a hospital where he underwent emergency surgery to stabilize his neck the following day.

Saginaw County operates the jail. PHS is a private, for-profit corporation that provides medical services in prisons, jails, and other detention facilities. Saginaw County signed a contract with PHS, now Corizon Correctional Healthcare, to provide health care services to persons incarcerated in the Saginaw County Jail. As of 2005, the corporation provided health care for about one in every ten people incarcerated. *See* Paul von Zielbauer, "As Health Care in Jails Goes Private, 10 Days Can Be a Death Sentence," *The New York Times*, Feb. 27, 2005, dkt. #40-8.

Dennis Lloyd, an osteopathic physician under contract with PHS, is the medical director at the Saginaw County Jail; he testified that he makes all medical decisions for inmates. He is also the medical director at the Genesee County Jail in Flint, Michigan. He maintains a private practice in Flushing, Michigan. Lloyd is on site at the Saginaw County Jail once weekly, on Friday from 7:30 a.m. to 3:30 p.m. Lloyd's private practice and the Genesee County Jail are both about a forty-five minute drive from the Saginaw County Jail. The average daily population in the Genesee County Jail is over 700 people; the average daily population in the Saginaw County Jail is 500 to 600 people. It appears that Dr. Lloyd is the only doctor providing medical care at these facilities.

At his deposition, Dr. Lloyd explained that he has never gone to the jail to treat inmates when he is off site and staff has never requested his presence off hours. Lloyd does not travel to the Saginaw County jail for emergency situations that might need his in-person attention; he simply phones in orders.

On May 21, 2010, upon his admission to the Saginaw County Jail, Shehee was entrusted to PHS's and Dr. Lloyd's medical care. Shehee was admitted on a Monday. Because Dr. Lloyd is only present at the jail on Fridays, Dr. Lloyd did not examine Shehee or contact his treating physician. Instead, PHS nurses screened Shehee and confirmed his January 2010 diagnosis for Type II diabetes.

-3-

PHS nurses also confirmed his prescriptions for 30 units of Lantus, once daily, and 500 mg of Metformin, twice daily. Nurses measured Shehee's blood sugar at 145 milligrams per deciliter (mg/dl); it was under control.

On May 24, 2010, PHS nurses contacted Dr. Lloyd and told him about Shehee's diabetes. PHS policy requires inmates with a prescription medication to continue to receive the medication as prescribed upon admission to the jail unless an acceptable alternative medication is provided. However, Dr. Lloyd ordered Shehee's medication switched to 70/30 Novolin over the phone. He did not examine Shehee or speak with Shehee's doctor before changing his medication. The only medical information Dr. Lloyd had at the time was Shehee's pre-existing medications, age, weight, and other information on the intake sheet. Lloyd "ha[d] no idea" if Shehee was given any explanation why his medication regimen was changed or what the change in medication might mean for him.

Dr. Lloyd testified that he changed Shehee's insulin medication from Lantus to NPH insulin because, as a general matter, 70/30 insulin requires less supplemental insulin to keep a patient's blood sugar under control. Plus, he said,

> in a jail setting, NPH insulin is preferred to synthetic flat and ultra-fast acting insulin. Generally, poorly controlled diabetes are [sic] better managed on NPH insulin until their diabetes is under control. Plaintiff was not properly managing his diabetes and it was not under control.

Lloyd dep. at 43. But later Dr. Lloyd conceded that Shehee's blood sugar was under control at admission and, in fact, "look[ed] very good." *Id.* at 64-65. And Dr. Lloyd testified that he is unaware of any scholarly articles or research that demonstrates that the pharmacodynamics of 70/30 insulin are preferable in the jail setting over Lantus. Further, PHS's own guidelines discourage use

of 70/30 insulin "unless patients are noncompliant as they reduce the flexibility in meal and activity planning." PHS Disease Management Program, dkt. #40-2.

It appears that one of the major differences between Lantus and NPH insulin is cost. According to one professional source, "[h]uman insulins (NPH and regular)" are "the least expensive [insulins], especially when using premixed NPH-regular insulin 70/30. Their use should be considered when the cost of medication is a major concern for the patient." Dr. Marwan Hamaty, MD, MBA, *Insulin treatment for type 2 diabetes: When to start, which to use*, Cleveland Clinic Journal of Medicine, Vol. 78, No. 5, May 2011, at 341, dkt. #40-4, at 11. The "only time" Dr. Lloyd prescribes Lantus is if a patient goes to the hospital and the endocrinologist or the internist specifically requests Lantus when the person returns to jail. In those circumstances, Dr. Lloyd defers to their judgment. Otherwise, "it's just a lot easier, many times, to go ahead and say okay, we will try the Lantus and see how [the inmate] does on the Lantus." Lloyd dep., dkt. #40-1, at 78.

Shehee initially complained to PHS nurses that they were giving him the wrong insulin. PHS Nurse Linda Bryson recalled those complaints and reported them to Dr. Lloyd. But Lloyd waited until after Shehee fell before he changed his prescription back to Lantus.

On September 13, 2010, the day he broke his neck, Shehee says that he woke up and went to the clinic for his blood sugar test and insulin dosage. The test showed an elevated blood sugar of 270 mg./dl., for which Shehee was given 12 units of 70/30 combination insulin. Shehee then returned to his cell and waited for his breakfast, which he ate at approximately 6:30 a.m. He napped and, upon waking, walked toward the toilet, felt dizzy, and fell, hitting his head and neck.

Other inmates observed Shehee lying on the floor and called for help. Nurse Bryson responded and looked for a brace to stabilize Shehee's neck — the jail had none — and then

ordered Shehee into a wheelchair to facilitate his medical examination. Nurses recorded his blood sugar as 62 mg./dl. around 9:00 a.m., a "drastic" decrease from earlier that morning, and the likely cause of his dizziness and fall. Shehee could walk with assistance, but couldn't raise his left arm above shoulder level.

Dr. Lloyd was called at 9:00 a.m. He was not at the jail and he did not travel there to evaluate Shehee. Instead, he ordered X-rays to be performed immediately on Shehee's head, neck, and shoulders. Nurse Bryson gave Shehee extra strength Tylenol and ordered guards to place him in the observation room. Shehee testified that he cried in the observation room from the pain in his neck and begged to go to the hospital. Nurse Bryson has no recollection of Shehee's tears. Nearly six hours later, at 2:32 p.m., the X-rays were finally performed. Shehee had suffered a "severe" spinal cord injury during the fall.

At 3:30 p.m., approximately seven-and-a-half hours post-injury, Dr. Lloyd was reached by phone and ordered staff to transfer Shehee to a hospital emergency room for evaluation. Shehee continued to complain of neck pain and numbness in his left arm. At 5:00 p.m., approximately nine hours after the fall, Shehee was transferred to the hospital in a police cruiser and underwent emergency surgery the following day to stabilize his neck. The surgeon reported that the injury "seemed more severe even than I anticipated." He said that Shehee's "spine was soft, and it was severely loose from his fracture." Two days later, doctors performed a second surgery to install metal plates and screws in his cervical spine.

When Shehee returned to the jail from the hospital, he requested PHS to discontinue 70/30 insulin and provide him with Lantus in accordance with the directives from his doctors at Covenant Hospital. Dr. Lloyd approved the change, "as long as the meds were available."

-6-

Sheehee filed his complaint in this Court, followed by an amended complaint, alleging in a single count that defendants Saginaw County and PHS violated his rights under the Eighth Amendment by maintaining policies that were deliberately indifferent to his serious medical needs. The plaintiff also named as defendants Saginaw County Sheriff William L. Federspeil in his official and individual capacities, and the Saginaw County Sheriff's Department. The Court dismissed those parties on the defendants' motion on May 21, 2014. Thereafter, the remaining defendants moved for summary judgment.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining if a trial is necessary to resolve the claims, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." 576 F.3d at 558 (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in

order to defeat the motion." *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." 350 F.3d at 546 (quoting 477 U.S. at 252) (quotations omitted).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

The Eighth Amendment prohibits jailors from wantonly depriving prisoners of necessary medical care. *Estelle*, 429 U.S. at 104-05. Jailors violate the Eighth Amendment when they exhibit deliberate indifference to a prisoner's serious medical needs and fail to address them adequately. To succeed on a claim of deliberate indifference, the plaintiff must offer evidence of both the objective serious medical need, and the defendant's subjective deliberate indifference to it. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001).

A serious medical need is "one that has been diagnosed by a physician as mandating treatment *or* one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).

"To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 707 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

The plaintiff has not sued any individual actors, notably Dr. Lloyd. Instead, he has limited his allegations to claims against Saginaw County and PHS, its contractor. The County cannot be held liable under 42 U.S.C. § 1983 merely for the acts of its employees or contractors. *Doe v.*

*Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)); *see also Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 403 (6th Cir. 2010). A constitutional claim against a municipality under section 1983 must be based on the County's own conduct, meaning that it must spring from its official policies, customs or practices. *Monell*, 436 U.S. at 691. It is well settled that private medical providers under contract to provide medical services to jail inmates act under color of law and are subject to suit under section 1983. *See Harrison v. Ash*, 539 F.3d 510, 521 (6th Cir. 2008) (citing *West v. Atkins*, 487 U.S. 42 (1988)). However, the same standards apply.

A.

The plaintiff's main complaint focuses on the conduct of Dr. Lloyd. Shehee argues that the evidence establishes a policy, custom or practice of treating Type II diabetes with 70/30 insulin with deliberate disregard for the inmate's individual treatment needs. The evidence does not show that such a policy came from PHS; if there was a policy for treating diabetics with one type of insulin, it was Dr. Lloyd's. To prevail, therefore, the plaintiff must show that the county or PHS or both are accountable for Dr. Lloyd's decisions.

1.

The defendants argue that, even if the nurses or Dr. Lloyd acted with deliberate indifference, neither Saginaw County nor PHS can be held liable under a theory of *respondeat superior*. The defendants are correct. "[U]nder § 1983, local governments are responsible only for their *own* illegal acts. They are not vicariously liable under §1983 for their employees' actions." *Connick v. Thompson,* --- U.S. ---, 131 S. Ct. 1350, 1358 (2011) (internal citation and quotation marks omitted). "Instead, a municipality is liable under § 1983 only where, 'through its deliberate conduct,' it was

-10-

the 'moving force' behind the injury alleged." *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (internal citations and quotations omitted). Saginaw County may not be held liable on a theory of *respondeat superior*.

2.

The Supreme Court has never extended *Monell* to private corporations acting under color of state law. But nearly every circuit to examine the issue, including the Sixth Circuit, has done so. *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (quoting *Harvey v. Harvey*, 949 F.2d 1127, 1129-30 (11th Cir. 1992) (collecting cases)).

It is not clear why. *Street v. Correctional Corporation of America* was the first Sixth Circuit case to extend *Monell* to private corporations. It did so without any meaningful explanation as to why private corporations should be insulated from vicarious liability. The court's more recent decisions provide no additional insight. *See Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014); *Savoie v. Martin*, 673 F.3d 488, 494 (6th Cir. 2012); *Johnson v. Karnes*, 398 F.3d 868, 877 (6th Cir. 2005).

Perhaps it is time to question the rationale for allowing private contractors to avoid liability for the acts of its employees. *See Shields v. Illinois Dept. of Corrections*, 746 F.3d 782, 794 (7th Cir. 2014) ("So the Supreme Court has not directly said whether *Monell* applies to private corporations, and there are powerful reasons to say no. Yet we and all other circuits that have considered the question have said yes. Why? It's not easy to say."). When the state outsources services that it customarily performs, financial pressures not otherwise present can predominate over other factors that might motivate responsible conduct. The *Shields* court has noted:

> Private prison employees and prison medical providers have frequent opportunities, through their positions, to violate inmates' constitutional rights. It is also generally

>cheaper to provide sub-standard care than it is to provide adequate care. Private prisons and prison medical providers are subject to market pressures. Their employees have financial incentives to save money at the expense of inmates' well-being and constitutional rights. The unavailability of qualified immunity for these employees is a deterrent against such conduct, but *respondeat superior* liability for the employer itself is likely to be more effective at deterring such actions. Insulating private corporations from *respondeat superior* liability significantly reduces their incentives to control their employees' tortious behavior and to ensure respect for prisoners' rights. The result of the current legal approach are increased profits for the corporation and substandard services both for prisoners and the public.

*Id.* at 794.

Those same financial pressures are evident here. A 2005 New York Times investigation described Prison Health Services as providing "flawed and sometimes lethal" medical care. Paul von Zielbauer, *supra*, dkt. #40-8. New York state investigators examining PHS "say they kept discovering the same failings: medical staffs trimmed to the bone, doctors under-qualified or out of reach, nurses doing tasks beyond their training, prescription drugs withheld, patient records unread and employee misconduct unpunished." *Ibid.* One investigation found that the doctor overseeing care in several upstate New York State jails phoned in his treatment orders from Washington. *Ibid.* In one investigative report, the chairman of the New York commission's medical review board criticized PHS for being "'reckless and unprincipled in its corporate pursuits, irrespective of patient care.'" *Ibid.* "'The lack of credentials, lack of training, shocking incompetence and outright misconduct' of the doctors and nurses in the case was 'emblematic of P.H.S. Inc.'s conduct as a business corporation, holding itself out as a medical care provider while seemingly bereft of any quality control.'" *Ibid.* "[I]n cutting costs," the New York Times reported, "[PHS] has cut corners." *Ibid.* Although the defenddants offer several reasons why Dr. Lloyd changed Shehee's medication, it appears that cost may have been a motivating factor.

*Respondeat superior* liability would provide a powerful counter-weight to the financial incentive to skimp on patient care. *Shields* makes that case, too, providing a compelling argument for treating private corporations differently than government municipalities. Nonetheless, this Court is bound by Sixth Circuit precedent, and *Street v. Corrections Corp. of America*, 102 F.3d 810, 818 (6th Cir. 1996), remains good law. Unless the Sixth Circuit reverses course, *respondeat superior* provides no basis to hold a private corporation liable for the tortious acts of its employees. PHS cannot be held liable for Dr. Lloyd's treatment decisions.

2.

A municipality may also incur liability for municipal policy effectively set by high-ranking individuals with final decision-making authority. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) (plurality opinion); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736 (1989). The same is true for a private corporation performing a governmental activity. *Johnson*, 398 F.3d at 877 (observing that "a private contractor is liable for a policy or custom *of that private contractor*, rather than a policy or custom of the municipality"). However, "[t]he official must . . . be responsible for establishing final government policy respecting such activity before the municipality can be held liable." *Pembaur*, 475 U.S. at 482-83. "Whether a given individual is such a 'policymaker' for purposes of § 1983 liability is a question of state law." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 813 (6th Cir. 2005).

The plaintiff argues that Dr. Lloyd is a final policymaker for the medical decisions that occur within the Saginaw County jail, and his decisions bind PHS and Saginaw County. The evidence does demonstrate that the discretionary decisions for patient care have been delegated to Dr. Lloyd

as the jail's medical director. *See* Lloyd dep., dkt. #40-1 at 19, 21, 30-32; *see also* Policy Number J-A-01, dkt. #40-1 ("Clinical judgments rest with a single, designated, licensed, responsible physician"); Policy Number J-A-02, dkt. #40-12 ("The Medical Director is a physician who has the final authority for making and reviewing all clinical decisions to ensure quality services for inmates."); Policy Number J-A-03, dkt. #40-13 ("Clinical decisions pertaining to direct health care of patients are the sole responsibility of the Medical Director"); Policy Number J-G-01, dkt. #40-15 ("The Medical Director establishes clinical practice guidelines and protocols for the management of chronic diseases that are consistent with national guidelines based on valid and reliable clinical evidence and clinical judgment."). However, "[t]he fact that a particular official — even a policymaking official — has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur*, 475 U.S. at 481-82. Instead, "the official's decisions [must be] final and unreviewable and . . . not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993).

In this case, the decision to prescribe a specific type of insulin to diabetic inmates at the jail certainly fell to Dr. Lloyd. And his practice of prescribing medication without examining patients first was his custom. But that activity was Dr. Lloyd's. And it appears that in behaving the way he did, he actually violated PHS's guidelines, which discouraged use of 70/30 insulin. He also acted contrary to the PHS policy that favored continuation of an inmate's prescription medication. The plaintiff has not brought forth evidence showing that Dr. Lloyd's medication decisions amount to policies that were not "constrained" by PHS's overarching policies. Holding PHS responsible for

Lloyd's discretionary decisions in this case about which medication to prescribe amounts to nothing more that the imposition of *respondeat superior* liability.

B.

Even if PHS or the county could be accountable for Dr. Lloyd's errant medical decisions, there remains the question whether those decisions amounted to deliberate indifference. The plaintiff argues that PHS maintained a policy of modifying prescription medications without regard to prisoners' individual medical needs, and a policy of restricted physician access. There is something to those claims. Lloyd oversees medical decisions at the Saginaw County Jail, a facility with an average daily population of 500 to 600 inmates. He is the only medical doctor at the jail and has the sole responsibility for the direct healthcare of each and every inmate. Lloyd dep., dkt. #40-1, at 31-32. He has similar responsibilities at the Genesee County Jail, an even larger facility, and maintains a private practice forty-five minutes from both jails. Although Dr. Lloyd is responsible for the healthcare of each and every inmate, Lloyd is physically present at the jail only one day per week. He does not drive to the jail off hours, even in emergencies. Instead, he provides phoned-in, long-distance care.

The plaintiff contends that Dr. Lloyd phoned in his medical care, a practice that did not allow the doctor to provide individualized, meaningful medical orders about his prescription medication. The defendants, of course, deny this. Dr. Lloyd, they note, testified that his "approach to diabetes management is an individual approach, depending upon the type and extent of the diabetes." Lloyd dep., dkt. #40-1, at 43-44. That claim proved false with respect to plaintiff Shehee, about whom Dr. Lloyd knew nothing when he ordered his insulin changed, except that he was a prisoner with diabetes.

Nevertheless, Dr. Lloyd did provide Shehee with *some* treatment for his diabetes — treatment that appeared to be adequate during the three months before his fall and injury. Lloyd's practices of limited contact, occasional care, and phoned-in treatment did not display the subjective disregard for Shehee's well being that characterizes deliberate indifference. *See Comstock*, 273 F.3d 693 at 707.

Deliberate indifference is the "equivalent of recklessly disregarding [a substantial risk of serious harm to a prisoner]." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (quoting *Phillips v. Roane Cnty.*, 534 F.3d 531, 540 (6th Cir. 2008)). It is true that the Sixth Circuit has held that "less flagrant conduct may also constitute deliberate indifference in medical mistreatment cases." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2002). That court has endorsed the idea that even when medical treatment is furnished, the Eighth Amendment is violated if the care is "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id*. at 844 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989)). However, differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnoses or treatment are insufficient to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995). "Deliberate indifference is not mere negligence," *Watkins*, 273 F.3d at 686, and, as noted earlier, mere allegations of malpractice are insufficient to state a claim, *Estelle*, 429 U.S. at 106. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir.1976). It is only "[w]hen prison officials are aware of a prisoner's obvious and serious need for medical

treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay" violates the Eighth Amendment. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004).

Whether a different medication would have better controlled Shehee's diabetes is not the sort of debate that rises to the level of deliberate indifference. The Court may infer deliberate indifference "only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982). If Shehee had fallen shortly after intake, that conclusion might be warranted. After all, Dr. Lloyd changed Shehee's medication before he evaluated Shehee and with limited, if any, meaningful information about his diabetes, medical history, and medication. But the fall happened in September 2010, four months after the plaintiff's incarceration and after four months of monitoring Shehee's diabetes. At the time of the fall, Dr. Lloyd had sufficient information to conclude that 70/30 insulin would adequately manage the plaintiff's diabetes.

Dr. Lloyd's practice of phoning in medical care raises significant concerns. But the facts of *this* case boil down to a disagreement about which medication Shehee should have been prescribed. There is no evidence in the record that Dr. Lloyd's choice was grossly incompetent, inadequate, or conscience-shocking.

The plaintiff's medical records suggest that Dr. Lloyd continued Shehee on 70/30 insulin based on his professional judgment. On May 31, 2010, Dr. Lloyd reviewed the intake form and ordered no changes to Shehee's medication. During the four months before his accident, nurses tested Shehee's blood sugar and administered his insulin twice daily. The purpose of the daily tests

was to monitor the plaintiff's insulin and make adjustments to the patient's insulin and oral medications as necessary. Dr. Lloyd twice concluded that changes were not necessary: first on June 24, 2010 and, second, on September 8, 2010. Informing that decision was a June 14, 2010 weighted blood test that revealed that Shehee's blood sugar was high and therefore poorly controlled on Lantus prior to his incarceration. Dr. Lloyd also entertained the general belief that the parmacodynamics of 70/30 insulin were preferrable over Lantus and his experience of getting "much better glucose results in patients in incarcerated settings" with 70/30 insulin. Lloyd dep., dkt. #31-5, at 82. The plaintiff does not argue that Dr. Lloyd failed properly to monitor his diabetes during this period; there is no evidence of any complications from the change in prescription drugs; and Shehee's complaints, while vocal, were limited. Dr. Lloyd's decision to continue Shehee on 70/30 insulin was based on his professional judgment.

Finally, Shehee argues that a jury reasonably could conclude that the delay in sending him to the emergency room exhibited deliberate indifference. However, he has presented no evidence that PHS has a policy of delaying the decision to send inmates to hospitals. Both Dr. Lloyd and Nurse Bryson testified that nurses have the authority to send inmates to hospitals in emergency situations. Even if such a policy existed, Shehee has not establish that the defendants were subjectively aware of the plaintiff's serious medical needs. Nurse Bryson testified that she did not recognize the plaintiff as having any symptoms of hypoglycemia or any trauma to his spinal cord. She thought the plaintiff may have only pulled a muscle. Upon receiving the X-ray results, Dr. Lloyd immediately ordered the plaintiff transferred to a hospital emergency room. The delay in transferring the plaintiff did not evidence a wanton desire to inflict pain, or otherwise display deliberate indifference to an obvious medical need.

III.

The conduct of the medical personnel at the Saginaw County Jail, all employed by defendant Prison Health Services, Inc., cannot be attributed to either of the remaining defendants in this case. The plaintiff has not offered any evidence of a policy by the defendants that exhibited deliberate indifference to the plaintiff's serious medical needs.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #31] is **GRANTED**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the defendants' motions *in limine* and to adjourn trial [dkt. #53, 54] are **DISMISSED as moot**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: January 5, 2015

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on January 5, 2015.

s/Susan Pinkowski
SUSAN PINKOWSKI